of America et al. Mr. Ware for the appellants, Mr. Kelly for Appley's United States of America et al., and Mr. Williams for Appley American Samoa government. May it please the court, this is a classic case of constitutional interpretation. The scope of the Citizenship Clause is answered by examining its text, structure, history, and purpose, which was to constitutionalize a pre-existing common law rule and put the question of citizenship by birth on U.S. soil beyond the political power. The court should follow the original meaning of the Citizenship Clause here, because this case presents issues of first impression, not squarely answered by precedent. The original meaning here is clear, as the Supreme Court explained in Wong Kim Ark and the Slaughterhouse cases. Wait a minute, what about all the cases dealing with the Philippines? In various circuits? So the cases addressing issues in the Philippines actually addressed a somewhat different question, which was, what happens to issues of citizenship upon exit from U.S. sovereignty? Upon what? What did you say? Exit from U.S. sovereignty. So the critical factual difference between the Philippines cases and this case here is that those claims were brought decades after the Philippines had no longer been part of the United States. In 1946- So what? The legal question is exactly the same. Whether or not people born during the time the Philippines was a possession of the United States were entitled to birthright citizenship. Isn't that exactly the same issue? Well, the question, again, is slightly different. It was, what was the status of these individuals many decades after independence? And upon independence, the people of the Philippines and the people of the United States, through a treaty that was ratified by the Senate, recognized that the people of the Philippines would become citizens of the Republic of the Philippines, surrendering their allegiance to the United States. But if your constitutional argument is correct, no legislation could have taken away their birthright citizenship, which they enjoyed by reason of being born during the time the Philippines was a territory. Well, there would be a difference between involuntarily taking away the citizenship of those individuals, versus what happened in the case of the Philippines, which was a voluntary surrender of citizenship. The Philippines had wanted to be independent from the United States for many decades. And so upon independence, there was a treaty that was ratified by- So you mean the key here is what the political view is of the territory? That's your point, that the Philippines had a different political view, and we should take that into account. That is your view, right? I would clarify it a little bit more. I would say the political determination that was made was to exit from United States sovereignty. But you want to honor the political decision of the Philippines. That's your point. Yes, to that degree. So then the question is, why don't we honor the political view of Samoa? And here, questions of political determination, we agree, are important on either the back end, as in the case of the Philippines, or on the front end, as in the case of American Samoa. So American Samoa's political leaders, through the Deeds of Session in 1900 and 1904, expressed unequivocally that they wanted to be part of the sovereign territorial jurisdiction of the United States. Those agreements were later ratified through congressional statute. And there was also a Senate treaty in 1900 recognizing U.S. territorial sovereignty over this area. And that's the important question with respect- But you know what I'm concerned about. I'm concerned about the position of the government of Samoa right this moment. Sure. And questions about the right of citizenship for someone born within the sovereign territorial limits is a question that's answered directly by the Citizenship Clause. The purpose of the Citizenship Clause was to remove these very questions from the legislative power so that future Congresses, future majorities- Now, our position on the Philippines is simply what the Supreme Court held in Robing v. Boyd, which is, upon independence, those born in the Philippines were aliens as to the United States. The question here is different. It's a question of people born on what is undisputed as sovereign U.S. soil, and that continues to be sovereign U.S. soil today. But if it were granted independence tomorrow, their citizenship would vanish? Through an agreement between the people of American Samoa and the people of the United States, they could reach that agreement. It's not an agreement between the people. It's an agreement between the nations. Correct. Through the sovereign power of two powers. So if there were an agreement of independence tomorrow, then they would have been citizens until tomorrow, and they would no longer be citizens? That's a question that could be answered through the political process. What question you have answered with respect to the Philippines? Would the same be true of American Samoa? Yes, it would be open to political determination through the political process what the two countries agreed to. And this is something that's consistent with a long-held Supreme Court precedent, looking at the common law principles of citizenship that were adopted and ratified in the Citizenship Clause. So the Supreme Court explained this general rule in a case, Boyd v. Nebraska in 1892, saying that the general rule was, quote, manifestly the nationality of the inhabitants of a territory become that of a government of whose dominion they pass. Going back further, there were a number of Supreme Court cases examining these issues of what happens when there's a transfer of sovereignty with respect to the United States becoming independent from Great Britain. The case is Trustees of Sailor's Snug Harbor in 1830 and McKelvey v. Cox's Lassie, which recognizes principle that's consistent with our argument of the Citizenship Clause that transfers of sovereignty have consequences in terms of citizenship and status. The question here is much simpler than the question presented in the Philippines cases, insofar as the Citizenship Clause directly answers the question of citizenship by birth within the dominion and allegiance of the United States. This is the test that the Supreme Court looked to in Wong Kim Ark just two years before American Samoa became part of the United States. And that decision looked closely at the original meaning of the phrase the United States in the Citizenship Clause and the purposes of the Citizenship Clause. If I could just turn to those now. The framers contemplate the existence of territories that would be unincorporated territories. You're talking about the original meaning, and I'm trying to focus on whether the original meaning in fact would have encompassed a territory within the category of American Samoa today or the Philippines at one time. Do you have linguistic evidence that the phrase at the time would have encompassed such a territory for a United States? So this distinction between incorporated and unincorporated territories didn't develop until the 1900s. I didn't invent that distinction today. It was developed in the 1900s, many decades after the Citizenship Clause was ratified. Are you really arguing from the original definition, original meaning of the United States at the time or not? I'm not saying you're not. I'm asking you if there is linguistic evidence for the inclusion of such a territory in the term at the time of the deduction. So the textual evidence of the Citizenship Clause is that in Section 1 of the Citizenship Clause they use the language in the United States, while Section 2 uses a more narrow phraseology. Section 2 is with respect to apportionment. They use the phrase in the several states. And so the significance of this textual distinction is highlighted by looking to the constitutional history around the drafting debates of the 14th Amendment. And during that time, discussion about the application of citizenship and the application of congressional powers of territories was in the forefront of the drafters' minds coming just on the heels of the Civil War and shortly after the Dred Scott decision was answered. And within that context, Senator Trumbull, who was the chairman of the Senate Judiciary at the time and one of the primary advocates of the 14th Amendment, explained with respect to this structural distinction, quote, the second section refers to no persons except those in the states of the Union, but the first section refers to persons everywhere, whether in the states or in the territories or in the District of Columbia. Just a few years after the 14th Amendment was ratified, the Supreme Court embraced this view and its decisions in the slaughterhouse cases. In the slaughterhouse cases, the court examined the meaning of the citizenship clause and said, quote, that it put at rest the argument that those who had been born and resided always in the District of Columbia or in the territories, though within the United States, were not citizens. This was a central question for the reconstruction to Congress to consider at the time because when the 14th Amendment was ratified, nearly half the land of the United States was part of the U.S. territory. Of the 20 largest states today, 12 of them were actually territories in 1868, and of the 37 states that existed at the time, nearly half of them had used to be a U.S. territory. And so the government's argument that the scope of the 14th Amendment would either not apply to territories or would not apply to certain territories but not others defies the purpose that the founders or the framers of the 14th Amendment were looking at. Let me ask you about a different part of this language because you've said several times that it's unambiguous, that you think the text is clear. But we've been talking about two things. One, what it means in the United States, and the other is within the jurisdiction, which seems to have something to do with a notion of allegiance. And I ask that because a little before the court decided the Wong Kim Ark case, it decided a case dealing with an Indian and whether or not such a person who was clearly born within the continental United States was also a citizen. Yes, so the subject of the jurisdiction language, looking at the constitutional history of the 14th Amendment, pretty clearly refers to two groups of people. One of them, as the court recognized in Elk v. Wilkins, is what they called wild Indian tribes not subject to U.S. authority, the other one being children of ambassadors. And so those two distinctions were drawn. But what's actually very interesting about how Elk informs this case is that the petitioner there was actually born in what at the time was a U.S. territory. This was not a point that was contested and argued by the parties in the case or addressed and contested by the court. And surely if they had not understood birth within a territory to denote citizenship, that would have been a much easier grounds to decide the case than looking at where exactly the petitioner fell on the line of his allegiance. But the other important point made in Elk v. Wilkins, and certainly reaffirmed in the Wong-Kim Ark decision, is really what is the touchstone of the citizenship clause and how do you go about answering questions that fall within its ambit? And in Wong-Kim Ark and in cases decided subsequently, the Supreme Court made very clear that the citizenship clause is, quote, to be interpreted in light of preexisting common law principles governing citizenship. And as in Elk and as in Wong-Kim Ark, the principles that come forth are birth within the dominion and birth within the allegiance. In terms of the language of the citizenship clause, this is really understood as birth within the de jure territorial sovereignty as opposed to ideas of de facto sovereignty or something else, as this court and the Supreme Court has recognized in other cases. And then allegiance being tied to the question of subject to the jurisdiction. And it's uncontested here in this case that American Samoa is subject to the jurisdiction of the United States. And it's also uncontested that American Samoa is subject to the full de jure sovereignty of the United States. With those... I'm sorry. Go ahead. The question that seems to arise here, and that's what I think is the difficult question, is American Samoa also has this long tradition of self-governance. In your view, does that impact at all on this question of allegiance? In other words, you know, if you are dealing with a territory that has its own government and has a long history of self-government, does the language of the 14th Amendment just override that? So I would draw a bit of a distinction in terms of what the nature of government is in American Samoa. So American Samoa's government really is a creation of federal action, primarily through the Department of Interior and as well through other executive and presidential actions. So if anything, territories, as with the District of Columbia, are even more subject to the jurisdiction of the United States than the states are because Congress exercises plenary power over American Samoa as it does all these other territories. So it's certainly undisputed that Congress could pass laws regarding their territorial structure, pass criminal statutes that can be enforced by the courts, and the history of American Samoa from 1900 to today demonstrates an increasing amount of ties between the United States and American Samoa as well as contributions from the American Samoan people to the United States. Counsel, you do not wish to bring our attention to how the Supreme Court dealt with the outlying possessions of the United States after the Spanish-American War, the insular cases and their reference in subsequent Supreme Court cases. You don't want us to focus on that at all. But isn't it fair to conclude that the Supreme Court, beginning then, recognized a sharp distinction, as Judge Santel mentioned earlier, between incorporated and unincorporated territories, and particularly unincorporated territories which had different culture? We don't dispute that distinction as being the law with respect to certain questions. So the insular cases address questions of territorial governance, which makes sense given that Congress has exercised under the property clause of plenary power, and it also addressed questions of criminal procedure. And so it addressed these in the context, in the historical context, of areas that had been acquired through military conquest and emphasized that this was a transition into the United States. And so to the degree that the cases weren't about the citizenship clause, they certainly weren't about American Samoa. But to the degree that the individual justices in the Downs opinion did talk about citizenship, they talked about it primarily from the perspective of entry into the United States sovereignty. The whole distinction, or at least a distinction, between incorporated and unincorporated is whether there's going to be an anticipated transition. Twice in your response to Judge Silberman, you made the assumption that they deal with transitioning into American sovereignty. In fact, the distinction is based on, at least in part, on whether we expect that transition. Isn't that correct? No, that's not quite correct, Your Honor. The questions of the insert cases and the distinction between incorporated and unincorporated did not draw distinctions between the exercise of U.S. sovereignty and not exercising U.S. sovereignty. So actually another decision that was— between incorporated and unincorporated, if it isn't based on the anticipated transition. What was the Supreme Court making that distinction, both in Downs and in those cases that have sat it down subsequently? Well, the territorial incorporation doctrine addresses issues of territorial governance and criminal procedure in these newly acquired areas where there— That's what it does. I want you to tell me what the distinction is between the two kinds of territories. If it's not based on the transition. Well, so maybe if I could approach it in another way. You're approaching it the way I'm asking you. Okay, sure. So the distinction is not one based on the exercise of U.S. sovereignty or the U.S. exercise jurisdiction. Tell me what it's not. Tell me what it is. It's simply— If it's not transition, then what is it? Yeah, it's simply allowing for a play in the joints for the application of certain constitutional rights where the application of those rights can raise practical considerations that may require kind of interest balancing to reach the result in the case. And so that's what happened in the Insular Cases, and that's what this court did in the King v. Morton decision, which applied this Insular Cases framework to questions of the jury trial in American Samoa. And what's notable among— Is it fair to say—excuse me for interrupting. Is it fair to say that the principle of constitutional law that applies here, coming from the Supreme Court in our own cases, is whether or not it's anomalous to recognize a particular constitutional right in an unincorporated territory? So that's the Supreme Court's test in Insular Cases, and this court's test in King v. Morton. So that is the law, is it not? It is the law, but whether or not that— All right, if that's the law, whether it's anomalous or not, isn't it fair to say that here is the one situation we have before us where an unincorporated territory does not want their citizens to be recognized as citizens of the United States? Doesn't that create an obvious anomaly? So if I could just contest a few points. That is the law, but whether the territorial incorporation doctrine answers the question of this case is something I'd like to talk about more. But to directly answer your question, whether the political decisions of a transitory majority today in America, so we should answer this question— Transitory majority. You know what? That's what happens in all democracies. We have transitory majorities. But permanent majorities exist only in dictatorships. Well, and the purpose of the Citizenship Clause was to remove this question of citizenship by birth on U.S. soil from the legislative power for these kinds of majorities to change. This was after the Civil War. This is the one constitutional provision which you say can't be judged as whether it's anomalous or not? Well, and just to give you a little more historical context— To answer your question, this one constitutional provision is superior to all other constitutional provisions, and therefore we do not judge it as whether it's anomalous or not to extend it to an unincorporated territory, which is inconsistent with what you said earlier. I don't think it is. I think that there's a question of constitutional interpretation here that we believe is guided by original meaning. There may also be a question to the degree that this case is answered by the territorial incorporation doctrine that this court's framework and King v. Morton would govern. That court's framework requires a factual— On the first point, it requires a holding that the right of citizenship is not a fundamental right, which we argue that it is. If the court disagrees with that and you're applying the territorial incorporation doctrine, you get to the question of whether it would be impractical or anomalous. Stop. Stop. Forgive me. Because why isn't it a matter of law? What's the factual determination here? Why isn't it a matter of law that it would be anomalous to regard citizens of Samoa as birthright citizens of the United States when Samoa objects to it? I'm just saying what this court's precedent is in King v. Morton, which is that it requires a factual determination to— But why is there a factual—what factual determination is appropriate in this case? Why wouldn't it—isn't this a question of law? Well, it's a balancing test, an interest balancing test between many different interests. Perhaps one of those interests is the position of the American Samoan government. Other interests certainly need to be balanced against individuals, such as the plaintiffs in this case, who do want to be recognized as citizens. This right is so basic and so fundamental that if we establish that it applies, we've removed the possibility of applying the anomaly analysis to any other right, haven't we? If we hold that these people in American Samoa are citizens of the United States, then we could not withhold any other constitutional right on the basis of anomaly if we want what we hold this to be, but an equal protection to it. So I think that in answering that question, you can look at the example of other territories where they are recognized as birthright citizens, and it's not contested that the territorial incorporation doctrine continues to apply in those places. By legislation. Sure, by legislation. The constitutional questions of equal protection are distinct from the questions of the citizenship clause. The citizenship clause is unique and different. If we have brought in the citizenship clause, why wouldn't the equal protection clause apply with respect to all other constitutional rights? Well, the American Samoan Court has already held that equal protection and due process do apply. We haven't brought in the citizenship clause yet. If we brought it in, why would not the equal protection clause bring in all the other kind of plea of constitutional rights? Well, this Court's doctrine in King v. Morton and the insert cases does require case-by-case determination of which race... But King v. Morton assumed the incorporated and unincorporated difference, did it not? The one you say doesn't apply anymore. Yeah, and it reached a conclusion that the right to jury trial exists in American Samoa that was a result that was actually different than the insert cases had already held based on these different factual circumstances. In that case, the American... In Hodel, excuse me, in Hodel we didn't proceed as we did in King v. Morton. Yeah, and in Hodel it wasn't as much an issue of whether that case, and Your Honor certainly knows it better than I do, that that case didn't turn on the distinction between incorporated versus unincorporated. It was a general question of whether Congress can create these kinds of courts in a territory. And so that was a question that was squarely within the property clause and the territorial clause of the Constitution rather than turning on this distinction. But regardless... Well, there was a due process question there, don't you remember? Yeah. And the argument there was that since the Secretary of Interior had control over the courts of Samoa, that violated due process. If, as Judge Santel suggests, if we recognize birthright citizenship, then I wonder how that case could have been decided the way it was. So as the court explained in that case... We don't normally allow the Secretary of Interior to have control over Article III courts. Yeah, there were administrative courts in American Samoa, as you know, and the question there was a similar question that had been presented in, addressed in the Supreme Court in the Cantor decision in Florida. This was simply an application of longstanding precedent that Congress has plenary powers in the territories with respect to questions of territorial governance. I would like to call your attention to something, because amicus, in this case, wish us to denigrate the Insular cases on the grounds that there has been a racist tinge. And I'm not unsympathetic to the argument, except for the fact that the latest case from the Supreme Court that's relevant is Boumediene. And in Justice Kennedy's opinion, he cites Downs approvingly with a quotation, it is obvious that in the annexation of outlying and distant possessions, grave questions will arise from differences of race, habits, laws, customs of people, and from differences of soil, climate, and production. So that's the Supreme Court in Boumediene approving the Insular cases and approving the opinion that the amicus, and to a certain extent you argue, should be ignored because it was the opinion of one judge, Judge Brown. I have a view that anything written by Judge Brown is axiom. Well, I hate to criticize that point. But Boumediene also says some other things about the Insular cases. And one of the critical points I think that addresses this conversation we've been having here is that the court in Boumediene explained that the Insular cases, quote, held that the Constitution has independent force in these territories, a force not contingent upon acts of legislative grace. And if you look at the distinction between… What did you just say about the legislative grace? That the Constitution has independent force in the territories, a force not contingent upon acts of legislative grace. Yet it took note of the difficulties inherent in that position. You forgot the next sentence. Did you see the next sentence? Yes. That's Justice Kennedy pointing out that that position is not necessary, it's not acceptable. It does create tensions. So in other words, the Supreme Court has come to the view that there are practical questions here, there are anomalies to be considered when one asks the question, what provisions of the Constitution, if any, extend to unincorporated territories? Well, and if I could just add, the Philippines cases, which, as you said, looked into some of these questions, they didn't look at the question of the citizenship clauses application of one of applying the territorial incorporation doctrine. So the court in that case actually made expressly clear, just a moment, that they said, quote, we rely on the intercases only to determine the meaning of the phrase in the United States. And then they went on to say we need not decide whether citizenship is a fundamental right, which would extend of its own force to a territory under the territorial incorporation doctrine. So even in the Philippines cases, which I think, you know, went down a path that they didn't need to go down because the Supreme Court had answered the question of citizenship on exit from sovereignty. In respect to Bumadine, which I realize I pronounced differently than the popular pronunciation, the particular holding of it, its eventual holding, deals only with the suspension clause. Is that not correct? Or am I wrong in that? Oh, no. You're absolutely right, Your Honor. And the suspension clause, even under that case, is still subject to a three-part balancing test to determine whether it applies in different territories or not, if it does not, different United States. That is what the court held. Right. And we subsequently held, applying that case in Makayla, that it did not apply in Bagram, for example, right? Correct. So really, the Bumadine is not very strong evidence for the proposition that every constitutional provision has to apply everywhere, is it? Well, and the distinction, of course, is that Guantanamo is only subject to the de facto sovereignty of the United States, whereas the territories of the United States are subject to de jure sovereignty. Didn't we spread the claim in Makayla that it's not a determination between de facto and jurisdiction? It's not fundamental to that. With respect to extraterritorial application of the Constitution, the question in this case is territorial application within the United States' territorial boundaries. But if I could just go back... unincorporated insular territories are within the meaning of the United States for purposes of that clause, right? Yeah, and it's important to look at what the insert cases themselves said. So Justice White's opinion in Downs, and then as well as the court's actual five-justice majority in Dorr, Dorr made the point, quote, the exercise of the power expressly granted to govern the territories is not without limitations. It finds limits and express prohibitions on Congress not to do certain things. This was the decision of actually five justices in the insert cases, and it's a point that goes to the importance of the citizenship clause, which the Supreme Court has repeatedly described as being, quote, a limitation on the powers of the national government. This isn't the same kind of provision as some of these other issues that were considered in the insert cases where these kinds of practical difficulties can be balanced and taken into account because the meaning of the citizenship clause is so clearly tied to this express notion of de jure sovereignty. It's important also to recognize that Downs wasn't the only case decided that day. The court also decided Dilema v. Bidwell, and in that case the four-justice plurality from Downs was actually in the dissent in Dilema. Dilema looked at whether Puerto Rico was a foreign country for purposes of certain statutes. The court framed the case as examining there. The court framed the case in looking at this question of whether it's a foreign country by looking to language of Chief Justice Marshall as whether it was, quote, one exclusively within the sovereignty of a foreign nation and without the sovereignty of the United States. And the government's arguments in this case actually bear much more closely to the dissent in Dilema, which argued, quote, Puerto Rico occupied a relation to the United States between that of being a foreign country, absolutely, and of being domestic territory, absolutely. And so that was a view that was expressly rejected in Dilema v. Bidwell, which as with the other insert cases remains the law today. The language that the majority in Dilema look to- Your phrase there is that the insert cases remain the law today. Is that correct? They are the law with respect to certain specific questions. They are the law when they're on your side and they're not the law when they're against you. Well, as the Philippines case has said, they began their description of the case as saying, quote, no court has addressed whether a person is born in U.S. territory or born in the United States within the meaning of the Fourth Amendment. So the insert cases have never been used by a court, the territorial incorporation doctrine, to answer this specific question of what the scope of the Citizenship Clause is. And if I could go back to in terms of this idea that the Citizenship Clause is a limitation on government power, Wong Kim Ark expressly held or expressly stated, quote, the 14th Amendment, while it leaves the power where it was before in Congress to regulate naturalization, which is the government's argument, has conferred no authority upon Congress to restrict the effect of birth declared by the Constitution to be a sufficient and complete right to citizenship. So the important test here held by the court in Wong Kim Ark, embraced by the text structure and constitutional history, as well as the context of the Citizenship Clause, is this idea, this common law rule, this pre-existing common law rule, which the Supreme Court has said is going to be the source of interpreting the application of these rights in areas as de jure sovereignty and subject to the jurisdiction of the United States. When those two prongs are met, as they are here, when there's a political decision to bring an area within the territorial sovereignty of the United States, that decision has consequences. And for those reasons, we believe the court should recognize here that the original meaning of the Citizenship Clause, as embraced by the Supreme Court, should recognize that our plaintiffs have a right to birthright citizenship. Thank you. Thank you. Good morning, Your Honors. Good morning. And may it please the Court, my name is Winn Kelly, appearing today on behalf of the Federal Appellees. Your Honors, the core issue in this case, as you've heard, is whether the plain language of the 14th Amendment extends birthright citizenship to non-U.S. citizens born on the unincorporated, outlying possession of American Samoa. Because American Samoa is not in the United States for purposes of the amendment, automatic birthright citizenship can be extended only through congressional action, which provides clear, defined parameters. In fact, this Court need look no further than the actual text of the amendment at issue in this case, which we've already heard about. All persons born or naturalized in the United States and subject to the jurisdiction thereof are citizens of the United States and of the state wherein they reside. Plaintiffs here arguably are subject to the jurisdiction of the United States, but were not born in the United States for purposes of the amendment, and have chosen not to naturalize the path available to them and provided by Congress. How do you get the plain language of the 14th Amendment to answer this question? The issue is what does the United States mean? Yes, Your Honor, and the United States... I was not terribly impressed by your brief in that respect in relying on the plain language. Your Honor, the plain language indicates that the amendment should apply only to the United States. Each side says the plain language supports their position, and honestly I remember something one of our former colleagues did well. He said when a lawyer says something is plain or clear, usually it's not. Unlike Judge Silverman, I want to know why it's clear that the plain language supports your side as opposed to the other side. The language here is clear, Your Honor, not only when you look to the amendment, but also when you look to the contemporaneous amendments that were passed, particularly the 13th, which chose to extend the abolition of slavery and involuntary servitude to not only the United States, but to any possession held by the United States. That difference should, the government argues... That gives you a little help. Yes, and that distinction informs... But aren't you really relying on the insular cases and the subsequent development of constitutional law? Yes, Your Honor. So if the court determines that the plain language is not adequate, then the insular cases, which still remain good law as plaintiffs must concede, and every federal court to address these issues, whether the 14th Amendment confers citizenship on an unincorporated outlying possession, has held that it does not, that that birthright citizenship can only be extended through congressional action. And as... Suppose Samoa took an opposite position here. Suppose the government of Samoa had come in and said, we support the plaintiffs on this. Obviously that's a different case in... Thank you. Do you know what happened many years ago when Judge Scalia was sitting here and a lawyer said that he threw the brief at him? I hope that will not happen here, Your Honor. If American Samoa had come in on the side of plaintiffs here, that would present a different question to the government. If that were the case, presumably American Samoa would, as every other territory... Would have had legislation. Yes, Your Honor. The only thing that's stopping legislation here is the government of Samoa. Yes, Your Honor. But why would that be a different case? In other words, if it's just the language, right? What is the... If just changing their mind would make a difference? I'm sorry, Your Honor. If it's just the language of the amendment? No. Yeah. In other words, you say, well, that would be a different case. You know, if they agree. But if it's driven by the language, then they're either within the United States and its jurisdiction or they're not. I see, Your Honor. For purposes of the amendment, American Samoa is not within the United States. However, Congress can extend birthright citizenship statutorily to unincorporated outlying possessions, as it has done in the case of the Virgin Islands, Guam, Puerto Rico, the Mariana Islands, and pre-statehood Alaska and Hawaii. So that would present a slightly different question about what the plain meaning of in the United States is versus what Congress may statutorily do. Congress is free to... Well, but suppose there was a hostile attitude in Congress towards Samoa, bringing Samoa in as... recognizing people born in Samoa as birthright citizens. Then what case? Then how would you handle this? If Samoa came in and said, we think our citizens are American citizens, and Congress, damn it, won't recognize it. I will not respond, as I did before, to Your Honor's question. That would be an issue where Congress... First, there would need to be evidence of Congress's inability to act, and it's possible that that would prevent Congress from presenting an issue where the Department of the Interior would need to work with Congress to determine what the needs of the people of American Samoa in concert with the government of American Samoa. It would no longer be anomalous, would it? No, Your Honor. So Samoa would have a powerful argument, wouldn't they, in that event? And so would the plaintiffs. The plaintiffs, and in particular, the government of American Samoa would have a powerful argument. And the plaintiffs would, too. Yes, Your Honor. Would you concede that they would win in that event? Yes, Your Honor. We concede that they would win, however. How many other people on your side of the courtroom shaking their heads no? Do you think you're authorized to express the opinion of the United States on that question? If the government of American Samoa were to attempt to obtain birthright citizenship for its people and it was unable to do so through obstruction of Congress and the executive, there would be a potential for a case for this court to investigate. However, that case is not present today. What is present is a situation where the Supreme Court's opinions and downs, as well as every other federal court to examine the issue, have determined that birthright citizenship can only be extended to unincorporated, outlying possessions like American Samoa through congressional action. And for those reasons, Your Honors, we request that the judgment of the district court be affirmed. Thank you. Good morning, Your Honors, and may it please the Court. Mike Williams from Kirkland & Ellis. I represent Congressman Amata, the elected representative of the American Samoan people to the United States Congress and the American Samoa government. I belabor that introduction a little bit because it really is relevant here for reasons that Judge Silberman brought out in the plaintiff's argument. This is a case where plaintiffs are urging on the court the anomaly of extending citizenship by judicial fiat over the wishes of the elected people of the territory. Now, I think that the United States government, in their briefing at this argument, have laid out all of the reasons why a plaintiff's request is literally unprecedented, that is, it's without any supporting precedent. In our briefs, we wanted to focus on why this isn't just an academic exercise for the Samoan people. That is, we understand that there are plaintiffs who are having rights abridged in this courtroom, and we think there are other avenues for those plaintiffs to obtain redress. But for purposes of the American Samoan government and the American Samoan people, this lawsuit really does represent what could be an existential threat to their way of life, to their culture. Now, that's important because... Why are you worried about that? The Supreme Court would never jeopardize the land ownership practices in Samoa. Is your view that the Supreme Court can't be trusted? Well, it's two responses to that, Judge Sintel. The first is... I'm sorry, Judge Silberman. Two responses to that, Judge Silberman. The first is... That's the first time I've ever been confused. We do look an awful lot alike. I'm thrown off by the portrait staring down at me, Judge Sintel, so I apologize, Judge Silberman. It's really unforgivable since you were a student of mine in administrative law. I forgot all about that. Forgot for this court. Forgot all about that. But the two responses to your question are, first and foremost, there's cold comfort in saying that the courts will protect this way of life when plaintiffs, in this case, without any precedent to support them, are asking for what would probably be a sea change in the status of the Samoan people. And the second response, Your Honor, is... American Samoan people shouldn't have to justify every aspect of their culture to the courts, having many years ago joined the United States, signed deeds of cession, with this understanding that they would be allowed to preserve these paramount interests of Samoan culture. That is, the Samoan system of land ownership, fa'asamoa, is very important, but it's not the only unique aspect of Samoan culture that still survives today, that's still of critical importance to Samoan people in those islands. In the briefs, we've laid out some examples, like mandatory prayer curfews, like things like having an upper house of legislature that's composed of Samoan chiefs. All of those things might not be consistent, arguably, with American citizenship, but all of those things are very important to Samoan people. So even if we can say, don't worry about communal land ownership, and there are reasons why Samoans would be worried about that, it's no answer to say that from this point forward, you'll be defending each of your cultural practices in courts in Washington, D.C., and that's precisely what the Congresswoman and what the government of American Samoa are looking to avoid here. So, I want to stress, Your Honors, we think on the law, whether it's a plain native argument, and I can understand the problems with that, or whether it's the practice that's subsisted for more than 100 years now, there's really no legal basis for extending birthright citizenship by fiat. Your Honor, Judge Silverman, you talked about the case law since the Insular Cases, since the American government started taking territories, and really the recognition there is almost unbroken, that the test is whether a territory is incorporated, that is predestined for statehood, Your Honor, or whether it is a possession or dependency of the United States. This is the case of American Samoa. Counsel seemed to recognize that the issue would be whether it's anomalous, and he argued, well, that's a factual issue that should be sent down to the district court. Your Honor, I think that's that suggestion. Again, that American Samoans will need to bring, I suppose, Samoan culture experts and present them to Judge Leon on remand. That would be even more of an incursion into Samoan self-determination and sovereignty than having to defend this lawsuit in the first place. And on that point, Your Honor, I know that there was testimony given in King v. Morton, but that case is from 1975. And you think Hodel sort of changed our approach to this question? I think Hodel recognized changes in the approach to the question because between 1975 when King v. Morton was decided. Should we pay any attention to the fact that that was written by Judge Ginsburg? I think it's a very well-written opinion, Your Honor, and it got the support of all the judges on the panel, which was also important. I'm a former faculty clerk for Judge Ginsburg. He clerked for Judge Ginsburg. It's a very well-written opinion, and I'll say that, Your Honor. You didn't help on that, did you? That would be a conflict of interest. No conflict of interest here. You may have some other conflict of interest. I assume that there's like a confluence of interest in other regards. That's absolutely right, Your Honor, and that's why I'm proud to say that I can stand here and represent the Samoan people in a case like this. And our briefs lay out all the ways, putting to one side any conflicts of interest, why this is so important for their culture and why even though there are people who are claiming harm here, they do view this as a threat, and they're urging these plaintiffs, for example, to seek other ways of addressing their injury. There are legislative options available. You know, Congressman Amata, who's newly elected. So your view is the anomaly issue would not be amenable to a factual determination. We can assume that as a matter of law, that it would be anomalous to recognize birthright citizenship over the objections of the government of Samoa. That's right, Your Honor. What about the question I asked counsel? Suppose the government of Samoa was on the side of the plaintiffs here. Couldn't be dispositive, Your Honor. If the government of American Samoa was on the side of the plaintiffs, that would be a factor. It's anomalous to grant citizenship over the government's wishes. But there are conceivably circumstances, I think, where people within American Samoa could say, for whatever reason, and this isn't the case here, that the government is non-representative, that there is oppression. It would be a different case, as counsel for the United States said, but I don't want to close the door on the fact that the government's views would be dispositive. So there are other remedies, though, Your Honor. And as counsel for the United States pointed out, every time citizenship has been extended to people in the outlying territories, it's been by statute. And that option's available here. In addition, Congressman Amata. What do you make of the fact that a number of the other territories, such as Puerto Rico, have filed an amicus brief on the side of the plaintiffs in this case? I don't know what to make of that fact, Judge Silverman. The fact is, the status of Puerto Rico with 4 million people and its history with the United States is very different from that of American Samoa in the South Pacific with 55,000 people. American Samoa is different culturally. Its history is different. There was Congressman Faleoma Vaenga, who initially got involved in this lawsuit, was fond of saying that American Samoa is the only U.S. territory that wasn't taken by conquest. That is, that this is a voluntary association. So there are different histories and different cultures. And I'll add to that, Judge Silverman, there are a lot of amici in this case. I saw a lot of law professors. I saw a lot of people who were very interested in this topic. But I hope that by standing here as an intervener for the American Samoa government, we can point out that this isn't just an academic exercise. This is the interesting as a law review article. But it's not. It's something that affects people's day-to-day lives in Samoa. And for all of these reasons, Your Honors, we ask you to affirm the judgment of the district court for all the reasons laid out by Judge Leon. And we thank you for your time. Thank you. Counsel, I know that you did not have any time left, but we will give you some additional time if you think you need it. Two minutes. Well, I would certainly agree with our colleagues that this is not an academic issue. For our plaintiffs who have been denied the right to vote because of their status, who have lost their jobs because of their status, we represent one veteran who has been denied the right to bear arms because of his status. So it's not an academic question for us either. Going back to what you had said about the history of American Samoa support for these questions, they haven't painted a clear picture of how that support has changed over time. So historical records actually demonstrate that at the time American Samoa signed the Deeds of Session, they believed that they were going to have full recognition of U.S. citizens. When they were later told that that was not to be the case, they fought for several decades to have that full recognition of citizenship that they thought had been part of the initial agreement. In fact, this legislation went so far as to be approved by the U.S. Senate twice unanimously, only to fail in the U.S. House because of opposition from the Navy. So it's not for a lack of trying that the American Samoan people have not been recognized as citizens. It's because the U.S. government has denied them that through the political process. Well, you see their position today. Yeah, and so their position has changed, and so I guess we should have just brought our case 50 years ago. But that highlights the challenges of using these kinds of practical considerations and interest balancing when interpreting the meaning of a constitutional provision that was specifically designed in text and purpose to remove those kinds of questions from political determination. Well, you agreed that now the issue is whether it's anomalous. The Supreme Court has changed the plain language kind of inquiry, haven't they? I'm getting at the outset of it. As a general matter, I don't think they have. With respect to specific questions like the right to jury trial that fall within the answer cases, perhaps so. But even then, the question of what is anomalous has turned on the kind of practical considerations of how something can practically or logistically be handled, how it's different from other areas. And on that point, certainly American Samoa stands out as the only U.S. territory where citizenship is not recognized. And as this Court, I think the holding in King v. Morton still is clear. I think it's still this Court's test in applying that answer cases doctrine in King v. Morton to the degree the answer cases doctrine comes into play. The question is, is it a fundamental right? We argue it is. Wong Kim Ark has recognized and courts have since recognized that birthright citizenship is indeed a fundamental right. And even if not, then the test is whether it's impractical or anomalous. And that requires, according to the Court, fact-finding, which would require a remand to the district court. Where, as occurred on remand in King v. Andrus, there was an opportunity for testimony from leaders on both sides of the issue in American Samoa. And ultimately, the Court there sided with the plaintiffs in the case in saying that it would not be a practical anomalous to exercise or to recognize the right to trial by jury in American Samoa, despite fierce opposition from American Samoa's elected officials. That case never came up on appeal. It did not. But I think that King v. Andrus was very diligent in following the commands of this Court, even to the degree that those raised some challenges in terms of how the Court proceeded. But they followed the edict of this Court in those cases, which was that there is a factual determination required of whether that right would be impractical and anomalous in American Samoa today. And they did not find dispositive the fact that the leaders of the territory at the time opposed recognizing a right to jury trial. I understand your position that this is not an academic exercise. But I think there's a question that Judge Sintel asked, and I wasn't sure if we ever got an answer to that question, and I think it's important. And that is, if we were to agree with you and found that birthright citizenship applied automatically here, wouldn't that bring in all of the Constitution? I mean, we would stop talking about whether anything was practical or anomalous, whether there were concerns about the Samoan way of life. The Constitution would simply apply in its entirety. Is that correct? So I would just, to answer that question, I would say that the concerns that have been raised by the interveners, those concerns have existed and been expressed repeatedly prior to our case being brought forward. So those concerns are related to what the Constitution means and what the Constitution requires. They don't turn on issues of citizenship or non-citizen national. So our position is that in recognizing rebirthright citizenship, the application of the Constitution as a general matter will really be what it was before our case was even brought to the court, which these rights, as the American Samoan High Court had recognized in Craddock, equal protection and due process already apply in American Samoa, regardless of whether they're recognized as citizens or non-citizen nationals. These other concerns they raise have already, there's already been constitutional questions raised. Within American Samoa as opposed to equal protection vis-a-vis the rest of the United States. I'm sorry, I'm not quite clear on that. You say that the prior precedent was that equal protection did apply in American Samoa. Are you looking to law that deals with rights within American Samoa or in American Samoa vis-a-vis the other citizens of the United States? So the question in that case was whether their land alienation laws were constitutional. And so I guess I'm not sure quite where on your line that would fall. But the court did expressly recognize that regardless of whether it was an incorporated or unincorporated territory, the fundamental rights of equal protection and due process require strict scrutiny of laws that create these kinds of racial determinations. Nonetheless, the court in that case upheld them based on a compelling interest that it found. Now, would the court be able to do that if you won today and got birthright citizenship? Would the court then be able to parse out whether that ethnic-based property history could still apply when it doesn't apply anywhere else in the United States? Yeah, so the distinction the court drew was there was a compelling interest in preserving Samoan culture that doesn't turn on whether they're citizens or non-citizen nationals. Indeed, those laws— Could that still be the case? Could that still be the case if we had birthright citizenship? Yes. And— Well, wait a minute. Would that not itself be anomalous? Yeah, well, I don't follow that. Suppose it was the same statutory arrangement in Arkansas. Would you say it would pass equal protection? Well, the defenders of the law would have to say what the compelling interest is there. And if it can't pass a compelling interest test, then it would be unconstitutional. In American Samoa, the court there recognized that there is a compelling interest. But our point is simply that these questions about equal protection and due process are separate questions from the question of the citizenship clause, which really is a unique right because it's the only enumerated right which is specifically tied to whether an area is subject to the sovereignty of the United States. These other issues do not have that express geographical and sovereignty-based determination in whether or not they apply. And so it may be proper to subject those kinds of rules under this kind of interest balancing or practical considerations. But where the constitutional command here is clear, we believe that it is answered by the original meaning of the citizenship clause. And to the degree that those practical considerations are warranted, this court's still, we believe, precedent in King v. Morton requires determination first, is citizenship a fundamental right? And if it is not, second, would that right be impractically anomalous? You keep ignoring Hodel. I don't think we're ignoring Hodel. We're simply looking at, you know, even in that case, the court examined, is this a fundamental right or not? We didn't remand. There was no remand in that case because it wasn't disputed that this was not. The plaintiffs argued for a remand. We didn't do it. Okay. The court did cite approvingly to King v. Morton in that case. I think that it was different in kind insofar as the questions really were one squarely about territorial governance under the Territory Clause, regardless of whether it was an incorporated or unincorporated territory. Whereas, really, in King v. Morton, you know, had American Samoan been recognized as incorporated territory, the question would have been absolutely clear that, of course, the right to jury trial applies there. It didn't fall into, you know, the Territorial Clause in that same way. If there are further questions, thank you.
judges: Brown, Silberman, Sentelle